[Cite as *In re J.W.*, 2023-Ohio-1582.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [J.W. et al., | : | |
| M.H., Father | : | No. 22AP-382 |
| | | (C.P.C. No. 18JU-1333) |
| Appellant]. | : | |
| | | (REGULAR CALENDAR) |
| | : | |

---

D E C I S I O N

Rendered on May 11, 2023

---

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Jessica M. Ismond*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, M.H., putative father, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch terminating his parental rights and granting permanent custody of his minor children B.W. and M.W. to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} Appellant is the putative father of three children, J.W. born January 31, 2004,[1] B.W. born July 27, 2006, and M.W. born April 24, 2008. Appellant is not married

---

[1] In the same judgment that granted permanent custody of B.W. and M.W. to FCCS, the juvenile court granted FCCS's request to place J.W. in a planned permanent living arrangement. Appellant did not contest this disposition in the juvenile court and does not challenge it on appeal.

to the children's mother, N.W.[2]  The events giving rise to this appeal began on August 17, 2017 when FCCS received a report indicating N.W. was hospitalized.  J.W. and M.W. were at the hospital with N.W.; B.W. was with a relative.  All three children were then transported to FCCS for safekeeping, as they were not permitted to stay with N.W. at the hospital, appellant's whereabouts were unknown, and no relatives were able to provide care.

**{¶ 3}**  FCCS filed a complaint in the juvenile court on August 18, 2017, docketed as Franklin C.P. No. 17JU-10299, asserting the children were neglected and dependent pursuant to R.C. 2151.03(A)(2) and 2151.04(C), respectively.  According to the complaint, appellant and N.W. had been homeless for the past two years and had recently been staying in an abandoned house.  The complaint further alleged appellant and N.W. had substance abuse issues.

**{¶ 4}**  A juvenile court magistrate issued an emergency care order on August 18, 2017 authorizing FCCS to provide temporary care for the children.  The magistrate then issued temporary orders of custody on August 21, 2017 granting temporary custody of the children to FCCS.

**{¶ 5}**  Due to statutory deadlines, FCCS refiled the complaint in November 2017, docketed as Franklin C.P. No. 17JU-13809, and again in February 2018, docketed as Franklin C.P. No. 18JU-1333.  The second refiled complaint forms the basis for the present appeal.  The complaint reasserted the allegations included in the previous complaints, with the following additions.  The children had been in the temporary custody of FCCS since August 2017 and were now in foster care.  Appellant had not provided the FCCS caseworker with an address; however, he met with the caseworker at public locations.  The caseworker provided appellant with substance abuse, mental health, and housing information.  Appellant had not completed any of the interim case plan objectives and had no contact with the FCCS caseworker for several months.  Appellant attended all but two scheduled visits with the children.

**{¶ 6}**  On February 6, 2018, a juvenile court magistrate issued an order maintaining the previous temporary order of custody to FCCS.  In a decision issued May 7, 2018, a

---

[2] The juvenile court's judgment also terminated N.W.'s parental rights as to B.W. and M.W. N.W. is not a party in this appeal. Accordingly, we focus our discussion of the procedural and evidentiary aspects of this case on those involving appellant, except where those aspects involving N.W. inform our discussion.

magistrate terminated the temporary order of custody, adjudicated the children to be neglected and dependent minors, and granted temporary court commitment of custody over the children to FCCS. The juvenile court adopted the magistrate's decision on May 7, 2018.

{¶ 7} A case plan was filed on May 1, 2018. Among other provisions, it required appellant to complete drug/alcohol and mental health assessments and follow all recommendations, complete random urine screens, attain and maintain safe and stable housing, attend in-home monthly meetings with the caseworker, and complete parenting classes. Under the case plan, appellant was permitted weekly one-hour supervised visitation with the children.

{¶ 8} FCCS moved for permanent custody of the children on July 16, 2018. At a hearing held before the juvenile court on May 7, 2019, FCCS moved to withdraw the July 16, 2018 motion for permanent custody to permit appellant additional time to complete his case plan objectives. In a judgment entry issued June 3, 2019, the juvenile court granted FCCS's request to withdraw the July 16, 2018 motion for permanent custody, extended the temporary court custody of the children to FCCS, and extended the case plan objectives.

{¶ 9} FCCS filed a new motion for permanent custody on July 26, 2019, asserting appellant failed to remedy the problems that caused the children to be removed from the home. FCCS alleged appellant failed to timely engage in and complete case plan objectives and subsequent recommendations related to substance abuse, mental health, and parenting issues.

{¶ 10} The juvenile court conducted a hearing on the motion for permanent custody on December 13, 2021. Appellant did not attend the hearing. Counsel for appellant was present and advocated on appellant's behalf; however, counsel provided no explanation for appellant's absence.

{¶ 11} Trina Wheaton, an FCCS caseworker, testified she was assigned to the case in 2018.[3] Upon initial review of the case, Wheaton verified the children had been in the temporary custody of FCCS since August 2017 and that a case plan was in place with the goal of reunification. Wheaton testified she attempted to contact appellant several times

---

[3] The prior caseworker did not testify at the permanent custody hearing.

per month; however, her interactions with him were "[c]onsistently inconsistent." (Dec. 13, 2021 Tr. at 14-15.)

{¶ 12} According to Wheaton, appellant moved from Columbus to Chillicothe, Ohio in late 2018 or early 2019. Following the move, Wheaton attempted to maintain contact with appellant and scheduled home visits with him. Wheaton testified appellant missed approximately 7 of 12 scheduled monthly home visits.

{¶ 13} Wheaton averred she met with appellant and discussed the case plan objectives with him both before he left Columbus and after he moved to Chillicothe. In an effort to aid appellant in achieving his case plan objectives, she provided him information about available community resources and services in both locations. Although appellant initially engaged in mental health counseling services both in Columbus and Chillicothe, he had not done so since 2019. Appellant told Wheaton he is not currently completing any case plan services.

{¶ 14} Regarding appellant's case plan objective related to his substance abuse issues, Wheaton averred appellant was initially required to complete drug screens in Columbus; however, appellant did not complete the drug screens while he lived in Columbus. After appellant moved to Chillicothe, Wheaton provided him gas cards and/or arranged transportation services so he could complete the drug screens in Columbus. In August 2020, Wheaton arranged for appellant to complete his drug screens in Chillicothe. However, appellant never appeared for drug screens in Chillicothe. At one point, appellant asked if he could complete the drug screens in Columbus, but did not provide a reason for this request. Wheaton checked with her supervisor who rejected the request. According to Wheaton, appellant had not completed a drug screen since November 2021.

{¶ 15} Wheaton also testified about appellant's interactions with the children. To that end, Wheaton averred appellant attended scheduled weekly visits with the children at FCCS offices when he lived in Columbus. However, visitation became more challenging after appellant moved to Chillicothe. According to Wheaton, appellant's last in-person visit with the children, which occurred at FCCS offices in Columbus, was in June 2019. The only other in-person visitation occurred in April 2021, when the children's maternal grandmother took them to Chillicothe to celebrate M.W.'s birthday. Wheaton also testified appellant told her that due to his challenging travel circumstances, he did not want

Wheaton to schedule visitation because it would "make him look bad at Court" if he were unable to attend. (Dec. 13, 2021 Tr. at 29-30.) According to Wheaton, appellant has chosen to forego in-person visitation with the children for years. Wheaton acknowledged that appellant residing in Chillicothe provided transportation barriers to visitation; however, she averred she had taken steps to address those transportation barriers and schedule visitation but appellant declined those efforts.

{¶ 16} Wheaton further testified that although appellant's visitation with the children was infrequent, she was present during visitation on at least five occasions. During those visits, Wheaton observed "[h]ealthy bonding" and "[w]orking together." (Dec. 13, 2021 Tr. at 33.) When asked to explain the phrase "working together," Wheaton averred appellant asked the children about school and attempted to "redirect any negative behaviors" reported by the foster mother. (Dec. 13, 2021 Tr. at 33.) Wheaton also noted the children cried at the beginning and end of each visit.

{¶ 17} Wheaton testified all three children currently live together in the same foster home. Except for a brief kinship placement with their maternal grandmother,[4] the children have lived in the foster home since January 14, 2018. During her visits to the foster home, Wheaton observed positive interaction between the foster mother and the children; she never observed anything warranting concern about the foster placement. Wheaton opined the children are bonded to the foster mother and each other. She described the bond between the children and the foster mother as "[c]omfortable, loving, hugging, able to have difficult conversations, go to [the foster mother] if they have an issue or a concern. She is fully vested in their education. They like that and then they don't like that. Very proactive in their academics * * * [a]nd their medical and mental health." (Dec. 13, 2021 Tr. at 38-39.)

{¶ 18} Wheaton further testified the foster mother is "[v]ery committed" to long-term placement; however, at the present time, she does not want to "entertain [the] thought" of adopting the children. (Dec. 13, 2021 Tr. at 40.) Wheaton opined the children

---

[4] Wheaton testified the children stopped living with their maternal grandmother and returned to the foster home at different times and for different reasons. Wheaton further averred that at one point, the maternal grandmother expressed interest in seeking custody of the children; however, the maternal grandmother is no longer interested in pursuing custody.

are in need of a legally secure, permanent placement. She is unaware of any relatives presently interested in pursuing custody.

{¶ 19} Wheaton recommended FCCS be granted permanent custody of B.W. and M.W.

{¶ 20} On cross-examination by appellant's counsel, Wheaton acknowledged appellant completed the case plan objective of attaining and maintaining safe and stable housing for the children, having secured and maintained housing in Chillicothe in late 2018 or early 2019. Wheaton further acknowledged appellant completed the case plan objective of submitting to a drug/alcohol assessment, having done so at a facility in Chillicothe in 2018. According to Wheaton, that facility did not view drugs or alcohol as a concern for appellant, and of the two drug screens the facility performed, one was positive for alcohol and the other was positive only for a prescribed medication.[5]

{¶ 21} When asked whether appellant had regular telephone contact with the children, Wheaton noted appellant provided B.W. a phone in order to facilitate contact. Wheaton described the telephone contact as "[c]onsistently inconsistent." (Dec. 13, 2021 Tr. at 46.) According to Wheaton, the telephone contact was "really good" during the early days of the COVID-19 pandemic. (Dec. 13, 2021 Tr. at 46.) During that period, appellant spoke to the children by telephone or Facetime video a couple times a week.

{¶ 22} Wheaton testified the children and appellant are bonded to each other. In past years, the children hoped to reunite with appellant; however, according to Wheaton, "it doesn't appear that way anymore." (Dec. 13, 2021 Tr. at 48.)

{¶ 23} Wheaton acknowledged appellant was in an automobile accident in July 2019. Prior to that point, Wheaton was hopeful appellant could complete his case plan objectives and reunify with the children. However, after the accident, appellant's efforts to comply with the case plan objectives diminished.

---

[5] On page six of its decision and entry, the juvenile court found, "by clear and convincing evidence[,] that [N.W.] and [appellant] have significant chemical dependency * * * issues that have not been sufficiently addressed to allow her to parent the children." Based on Wheaton's testimony that the Chillicothe facility did not view drugs or alcohol as a concern for appellant, it is not clear why the juvenile court made this finding as to appellant. Given the court's statement that chemical dependency issues had not been sufficiently addressed to allow "her" to parent the children, it appears the court may have intended its finding to apply to N.W. and inadvertently included appellant in that finding.

{¶ 24} Wheaton further acknowledged appellant has been respectful and polite during their in-person communications, appears to care about his children, and has indicated he wants them to live with him. Wheaton noted one incident, during a meeting in Chillicothe in 2019, where appellant appeared to be under the influence of some type of substance. According to Wheaton, appellant was "totally zoned out" during that meeting. (Dec. 13, 2021 Tr. at 51.) However, N.W. (who was also present at the meeting) ascribed appellant's behavior to lack of sleep the previous night.

{¶ 25} Paul Morrison, the guardian ad litem appointed for the children, testified he was assigned to the case on December 19, 2018.[6] He observed the children in their foster placement and had "[n]o concerns" about the foster home. (Dec. 13, 2021 Tr. at 58.) Morrison opined the children are bonded with the foster mother. Morrison echoed Wheaton's testimony regarding the foster mother's present hesitation to commit to adoption. However, Morrison averred that given the foster mother's demonstrated long-time investment in the children's lives, he expects that if FCCS is granted permanent custody of the children, the children will remain with the foster mother until they are placed in an adoptive home.

{¶ 26} Morrison testified he met with the children on several occasions. Over time, their wishes regarding reunifying with appellant changed drastically. According to Morrison, both B.W. and M.W. initially wanted to reunite with appellant. However, B.W. no longer desires reunification because appellant is not "stable enough." (Dec. 13, 2021 Tr. at 64.) B.W. is amenable to a grant of permanent custody to FCCS; however, she does not want to be adopted. For the same reason articulated by B.W., M.W. no longer wants to reunify with appellant. M.W. is open to adoption. Morrison testified that "at this point in their lives they believe their parents have failed them and * * * they're tired of being hurt and * * * they just want to move on. They want permanency." (Dec. 13, 2021 Tr. at 66-67.)

{¶ 27} Morrison averred the children's maternal grandmother, who in 2019 expressed interest in pursuing custody of the children and with whom the children lived for a time, is no longer interested in doing so. Morrison further averred he is unaware of any other relatives who are viable candidates for acquiring custody of the children.

---

[6] The prior guardian ad litem was appointed February 6, 2018. She did not testify at the permanent custody hearing.

{¶ 28} Morrison testified he communicated with appellant "quite a bit" when he was first assigned the case. (Dec. 13, 2021 Tr. at 60.) He visited with the family (including N.W.) once in Columbus. After appellant moved to Chillicothe, Morrison had difficulty locating appellant; appellant's counsel eventually provided Morrison an address for appellant. Morrison met with appellant at his home in Chillicothe in May 2019. He described the home as "appropriate" and "a nice place." (Dec. 13, 2021 Tr. at 68.) However, he has had no communication with appellant since that encounter.

{¶ 29} Morrison testified appellant has not sufficiently completed his case plan objectives, but acknowledged appellant has achieved the case plan objective of obtaining and maintaining appropriate housing. However, Morrison averred appellant has not maintained contact with the drug/alcohol provider and has not consistently completed drug screens.

{¶ 30} Morrison recommended FCCS be granted permanent custody of B.W. and M.W.

{¶ 31} Following the presentation of evidence, the juvenile court permitted the children's attorney[7] to speak on their behalf as to their current wishes. According to counsel, B.W. would like to visit with appellant and, although she is unsure about adoption, she would like to continue living with her foster mother. M.K. wants the benefits of a permanent custody commitment and wishes to continue living with his foster mother.

{¶ 32} The juvenile court issued a decision and judgment entry on June 6, 2022 granting permanent custody of B.W. and M.W. to FCCS. The court concluded the children met the statutory criteria for permanent custody and that it was in the children's best interest to terminate appellant's parental rights and commit the children to the permanent custody of FCCS.

## II. Assignment of Error

{¶ 33} Appellant appeals and assigns the following sole assignment of error for our review:

> [I]. The juvenile court's judgment, that permanent court commitment (PCC) of the minor children, B.W. and M.W., to

---

[7] The children's prior attorney was the original guardian ad litem and was appointed as the children's attorney effective December 19, 2018. The prior attorney withdrew on December 29, 2020. The attorney who represented the children at the permanent custody hearing was appointed September 14, 2021.

Franklin County Children Services was in the minor children's best interests, is against the manifest weight of the evidence.

## III. Discussion

{¶ 34} "Parents have a 'fundamental liberty interest' in the care, custody, and management of [a] child." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Santosky v. Kramer, Commr., Ulster Cty. Dept. of Social Servs.*, 455 U.S. 745, 753 (1982). As such, "[t]he right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. However, that right is not unlimited, and the state has broad authority to intervene to protect children from abuse and neglect. *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 23. As an "alternative of last resort * * * only justified when it is necessary for the welfare of the children," a court may terminate parental rights and commit a child to the permanent custody of a public children services agency. *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26. Due to the extreme nature of this remedy, which has been compared to the family law equivalent of the death penalty, parents must be afforded every procedural and substantive protection authorized by law. *L.B.* at ¶ 22.

{¶ 35} The juvenile court may grant permanent custody of a child to a public children services agency if the court determines by clear and convincing evidence that: (1) it is in the child's best interest, and (2) one of the factors in R.C. 2151.414(B)(1) applies. R.C. 2151.414(B)(1); *Id.* at ¶ 24. In deciding whether granting permanent custody is in the child's best interest, the court must consider all relevant factors, including specific factors set forth in R.C. 2151.414(D)(1)(a) through (e). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 36} On appeal, this court will not reverse a juvenile court's decision on a permanent custody motion unless the decision was against the manifest weight of the evidence. *L.W.* at ¶ 8. " 'Judgments supported by some competent, credible evidence going

to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "[I]n reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *L.B.* at ¶ 27. This court must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment, and, if the evidence is susceptible of more than one construction, give it the interpretation most consistent with the juvenile court's judgment. *Id.* at ¶ 28. In addition, this court has held that a juvenile court's discretion in determining whether permanent custody is in the child's best interest " ' "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." ' " *In re A.L.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8, quoting *In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist.1994).

{¶ 37} In his sole assignment of error, appellant contends the juvenile court's conclusion that permanent court commitment to FCCS was in the children's best interest was against the manifest weight of the evidence. We disagree.

{¶ 38} As explained above, a juvenile court may grant permanent custody of a child to FCCS only upon a determination that clear and convincing evidence establishes that such a grant is in the child's best interest and one of the factors in R.C. 2151.414(B)(1) applies. Here, FCCS moved for permanent custody under both R.C. 2151.414(B)(1)(a) and (d), and the juvenile court made findings under both sections. The court first found under R.C. 2151.414(B)(1)(d) that the children were in the temporary custody of FCCS for 12 or more months in a consecutive 22-month period. Appellant does not dispute this finding and the undisputed evidence at the permanent custody hearing supports it. Indeed, the record reveals the juvenile court placed both children in the temporary custody of FCCS on August 21, 2017 and they have remained in the temporary custody of FCCS throughout this case. FCCS filed the motion for permanent custody on July 26, 2019.

**{¶ 39}** The juvenile court also found the children could not be placed with appellant within a reasonable period of time under R.C. 2151.414(B)(1)(a) and the factors set forth in R.C. 2151.414(E)(1), (2), (14), and (16). The court further found that no evidence was presented regarding the factors set forth in R.C. 2151.414(E)(3) through (13), and (15).

**{¶ 40}** " 'When a child has been in the temporary custody of FCCS for 12 or more months in a consecutive 22-month period, the court need not find that the child cannot or should not be placed with either parent within a reasonable time.' " *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 56, quoting *In re D.G.*, 10th Dist. No. 09AP-1122, 2010-Ohio-2370, ¶ 11, citing *In re Williams*, 10th Dist. No. 02AP-924, 2002-Ohio-7205, ¶ 46. " 'The question of whether the child cannot or should not be placed with either parent within a reasonable time under R.C. 2151.414(B)(1)(a) becomes relevant only where the child has not been in agency custody for the requisite time under subsection (d). Subsections (a) and (d) of R.C. 2151.414(B)(1) are, accordingly, mutually exclusive.' " *Id.*, quoting *D.G.* at ¶ 11.[8] As such, because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was unnecessary for the juvenile court to determine whether the children cannot or should not be placed with appellant within a reasonable time under R.C. 2151.414(B)(1)(a).

**{¶ 41}** The crux of appellant's challenge, therefore, and as articulated in his assignment of error, is whether the juvenile court erred by concluding that granting permanent custody to FCCS was in the children's best interest. In so determining, the juvenile court must consider all relevant factors, including five specific factors set forth in R.C. 2151.414(D)(1)(a) through (e). While the juvenile court is not required to expressly discuss each R.C. 2151.414(D)(1) factor, it must make some indication on the record that all the factors were considered in its analysis. *In re A.C.*, 10th Dist. No. 22AP-243, 2023-Ohio-836, ¶ 54, citing *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, ¶ 12. Further, the juvenile court need not expressly discuss every fact it relied on in reaching a best-interest

---

[8] In *In re T.L.*, 10th Dist. No. 20AP-591, 2021-Ohio-3221, this court noted that "[a] finding that R.C. 2151.414(B)(1)(a) applies to the children * * * is at odds with [a] finding under R.C. 2151.414(B)(1)(d) because subsection (a) requires that the 'child *has not* been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period,' whereas a finding under subsection (d) requires that 'the child *has been* in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period.' " (Emphasis sic.) *Id.* at ¶ 15, fn. 1.

conclusion. *In re Bil.I*, 10th Dist. No. 22AP-127, 2023-Ohio-434, ¶ 54, fn. 6, citing *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 31. Under the statute, no single factor is given greater weight than the others. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. " '[T]he focus of the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents.' " *C.W.* at ¶ 57, quoting *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 20, citing *Awkal* at 315. On review, this court must determine whether the trial court's conclusion regarding the children's best interest was supported by the manifest weight of the evidence. *L.B.* at ¶ 29.

{¶ 42} The first factor in determining whether permanent custody is in the child's best interest requires the court to consider the interaction and interrelationship of the child with the parents, siblings, relatives, foster caregivers, and others. R.C. 2151.414(D)(1)(a). In considering this factor, the juvenile court cited Morrison's testimony that he never had an opportunity to observe the children visiting with appellant because the visits did not occur with any frequency. The court further noted Morrison's testimony that he had observed the children in their foster placement and found the children bonded to each other and to their foster mother. The court also cited Wheaton's testimony that the children are bonded to each other, to appellant, and to the foster mother. In addition, the court noted the testimony of both Morrison and Wheaton regarding the foster mother's commitment to the children even if she was not presently fully committed to adopting the children should it become possible to adopt them.

{¶ 43} Appellant contends the evidence did not show that he presented any risk of harm to the children and there was no history that he ever neglected or abused the children. In asserting this argument, appellant does not reference any of the R.C. 2151.414(D)(1) best interest factors. Rather, appellant appears to dispute the juvenile court's finding that no evidence was presented as to R.C. 2151.414(E)(3),[9] which, as already noted, is one of the factors a trial court must consider under R.C. 2151.414(B)(1)(a). As explained above, a juvenile court need not consider R.C. 2151.414(B)(1)(a) and the related factors in R.C. 2151.414(E) when the time requirements under R.C. 2151.414(B)(1)(d) have been satisfied. We further note that appellant's assignment of error unequivocally asserts his

---

[9] R.C. 2151.414(E)(3) addresses whether a parent has abused or neglected the child.

disagreement with the juvenile court's conclusion that granting permanent custody to FCCS was in the best interest of the children. The best interest factors are found in R.C. 2151.414(D)(1).

{¶ 44} Accordingly, because appellant's argument arguably pertains to his relationship with his children, we construe it as a challenge to the trial court's finding under R.C. 2151.414(D)(1)(a). " '[R]esolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent.' " *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 21, quoting *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. " 'Courts have considered the consistency of a party's visitation with [the children] when resolving the R.C. 2151.414(D)(1)(a) factor.' " *Id.*, quoting *K.R.* at ¶ 82. Wheaton averred appellant's last in-person visitation was in Columbus in June 2019, and he exerted little effort to visit his children after he moved to Chillicothe. She stated appellant declined her efforts to facilitate visitation after he moved to Chillicothe, eventually telling her he did not want her to schedule visitation because the court would look unfavorably on him if he were unable to attend. Although the juvenile court did not expressly so state, it appears the court found the R.C. 2151.414(D)(1)(a) factor weighed in favor of granting FCCS permanent custody.

{¶ 45} The second factor in determining whether permanent custody is in a child's best interest requires consideration of the child's wishes, as expressed by the child or through the child's guardian ad litem, with due regard for the child's maturity. R.C. 2151.414(D)(1)(b). As noted previously, the guardian ad litem testified that initially M.W. and B.W. expressed they wanted to reunify with appellant, but that they no longer wished to reunify. The court noted the statements made by the children's attorney on their behalf that: neither B.W. nor M.W. wishes to reunify with appellant, B.W. wants to remain in the foster home although she had not yet decided whether she wants to be adopted, and M.W. wants the court to grant permanent custody, and he wants to continue living with his current foster mother. The court further noted "[t]he children were represented by counsel as the [guardian ad litem] perceived a conflict of interest at one point in the litigation.[10]

---

[10] At a hearing held on September 7, 2021, the guardian ad litem requested the juvenile court appoint an attorney to represent the children because "there's a conflict of my recommendations and their wishes." (Sept. 7, 2021 Tr. at 7.) The September 16, 2021 entry appointing the attorney for the children noted the appointment was due to a conflict "between the [guardian ad litem] and the child[ren]." (Sept. 16, 2021 Entry.)

[The children's attorney] stated the children's wishes for the record." (Decision & Jgmt. Entry at 11.)

{¶ 46} Although appellant does not challenge the court's findings regarding the children's wishes as voiced by the children's attorney, we note that R.C. 2151.414(D)(1)(b) specifically requires consideration of the children's wishes as expressed by the child or through the child's guardian ad litem. Here, the guardian ad litem provided testimony at the hearing about the children's wishes, i.e., that neither B.W. nor M.W. wished to reunify with appellant, that B.W. is amenable to permanent custody to FCCS but does not want to be adopted, and that M.W. is open to adoption. In considering the children's wishes, the juvenile court arguably should have considered the testimony of the guardian ad litem. However, because that testimony essentially confirmed the statements made by the children's attorney as to the children's wishes, any potential error in failing to consider the guardian ad litem's testimony is harmless. *See In re J.G.*, 10th Dist. No. 22AP-10, 2022-Ohio-4072, ¶ 39, quoting *Foy v. Ohio Atty. Gen.*, 10th Dist. No. 21AP-420, 2022-Ohio-62, ¶ 15 (" '[a]bsent any indication of material prejudice, error is harmless and cannot serve as a basis for reversal' ").

{¶ 47} The third factor in determining a child's best interest is the child's custodial history, including whether the child has been in the temporary custody of a public children services agency for 12 or months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). The juvenile court found that at the time of the permanent custody hearing, the children had been in FCCS temporary custody continuously for 52 months, and that this extensive custodial history of 52 continuous months supported FCCS's motion for permanent custody. As noted above, appellant does not contest that the children have been in the temporary custody of FCCS for more than 12 months of a consecutive 22-month period.

{¶ 48} The fourth factor in determining whether permanent custody is in a child's best interest requires consideration of the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. R.C. 2151.414(D)(1)(d). The juvenile court concluded the children are in need of a legally secure placement and that such could not be achieved without a grant of permanent custody.

{¶ 49} Appellant first contends the evidence did not demonstrate that permanent court commitment would achieve legally secure placement because the foster home was not a prospective adoptive home. Initially, we note that appellant arguably mischaracterizes the evidence presented on the adoption issue. As set forth above, both Wheaton and Morrison testified that the foster mother expressed hesitation in committing to adopting the children at the present time. However, neither Wheaton nor Morrison definitively stated that the foster mother would never adopt the children. However, even if the current foster placement is not a prospective adoptive home, "the permanent custody statutes do not require FCCS to prove that adoption is likely." *C.W.* at ¶ 76, citing *In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51-52.

{¶ 50} Appellant also contends the primary reason for the children's removal from his care was his homelessness. He maintains he completed the case plan requirement to attain and maintain safe and stable housing for the children, having maintained a home in Chillicothe since 2019. However, it appears homelessness was not a factor in determining whether to grant the motion for permanent custody because the evidence established that appellant completed his housing objective. Moreover, the housing requirement was only one of the objectives the case plan required appellant to complete. As noted above, the case plan also required appellant to complete objectives related to mental health, substance abuse, and parenting practices. Although the juvenile court did not specifically address the case plan requirements in its analysis of the best interest factors under R.C. 2151.414(D)(1),[11] the testimony offered by Wheaton and Morrison establishes that appellant completed only the case plan objective related to housing. Contrary to appellant's arguments, the record supports the juvenile court's finding that he could not meet the children's need for a legally secure permanent home.

{¶ 51} The fifth and final factor in determining whether permanent custody is in the best interest of the child requires consideration of whether any of the factors set forth in R.C. 2151.414(E)(7) to (11) apply in regard to the parents and the child. R.C. 2151.414(D)(1)(e). Those factors apply when a parent has been convicted of or pleaded guilty to certain criminal offenses, has repeatedly withheld medical treatment or food from

---

[11] The court addressed appellant's failure to complete the case plan requirements as to substance abuse, mental health, and parenting skills in its analysis of R.C. 2151.414(B)(1)(a) and (E)(1).

a child, has placed a child at substantial risk of harm multiple times due to alcohol or drug abuse and refused to participate in treatment, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of a child. The juvenile court found that no evidence was presented as to this factor. Appellant does not challenge this finding.

{¶ 52} In addition to the five enumerated factors, the statute provides that in determining the best interest of a child, the juvenile court shall consider "all relevant factors." R.C. 2151.414(D)(1). The court stated it had "carefully reviewed the testimony and the evidence presented; the entire file; and the applicable law." (Decision & Jgmt. Entry at 12.) The court's averment that it reviewed the testimony, the evidence and the entire file, coupled with its specific consideration of the five enumerated factors set forth in R.C. 2151.414(D)(1)(a) through (e), satisfies the requirement that it "consider all relevant factors."

{¶ 53} Finally, we note appellant devotes a significant portion of the "Statement of the Case and Facts" section of his brief to a discussion of the 11 guardian ad litem reports filed between March 2, 2018 and December 8, 2021. (Appellant's Brief at 3, 5-7, 9-11.)[12] We presume appellant intends this recitation as a demonstration of his historically strong bond with the children, including his positive and nurturing parenting efforts prior to the children coming into FCCS custody, his consistent efforts to visit the children after they were taken into FCCS custody, the children's early fervent desire to reunify with him, and his initial efforts to work toward achieving his case plan objectives. Although appellant's narration focuses on the affirmative aspects of appellant's relationship with the children and his efforts at reunifying with them, the narration also candidly acknowledges the deterioration of his relationship with the children, which culminated in the children's eventual declaration that they did not wish to reunify with appellant, and his failure to complete his case plan objectives. Thus, appellant's references to the guardian ad litem reports do not meaningfully aid his cause.

{¶ 54} After careful review of the evidence and testimony presented at the hearing before the juvenile court, we find there was competent credible evidence to support the court's conclusion that terminating appellant's parental rights and granting permanent

---

[12] The prior guardian ad litem filed reports on March 2, August 8, October 11, and December 10, 2018. The guardian ad litem who testified at the permanent custody hearing filed reports on May 7 and August 26, 2019, August 17 and December 1, 2020, May 11, August 31, and December 8, 2021.

custody to FCCS was in the children's best interest. The children have been in the temporary custody of FCCS for an extended period. Both the guardian ad litem and FCCS caseworker testified the children are bonded to each other and their foster mother. Although the foster mother may not be presently amenable to adopting the children, she has exhibited a long-time commitment to the children. Both children indicated to the guardian ad litem and their attorney that they do not want to reunify with appellant and wish to continue living with their foster mother. M.W. directly indicated he wants to be adopted. The hearing on the permanent custody motion was held more than four years after emergency care and temporary custody were first ordered, and still appellant has failed to comply with portions of the case plan and has not made sufficient, consistent effort to demonstrate he can provide stability to the children. Under these circumstances, we cannot conclude the juvenile court clearly lost its way in determining it was in the children's best interest to terminate appellant's parental rights and grant permanent custody to FCCS.

{¶ 55} For the foregoing reasons, appellant's sole assignment of error is overruled.

## IV. Conclusion

{¶ 56} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

_____